## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TV ONE, LLC
1010 WAYNE AVENUE
TENTH FLOOR
SILVER SPRING, MD 20910

REACH MEDIA, INC.
13760 NOEL ROAD
SUITE 750
DALLAS, TX 75240

      Plaintiffs,

         v.

UNIVERSAL MCCANN WORLDWIDE, INC.
100 WEST 33RD STREET
NEW YORK, NY 10001

      Defendant.

COMPLAINT AND JURY DEMAND

## COMPLAINT

Plaintiffs, TV One, LLC ("TV One") and Reach Media, Inc. ("Reach") (collectively, "Plaintiffs"), by and through undersigned counsel, bring this Complaint against Defendant Universal McCann Worldwide, Inc. ("McCann" or "Defendant"), and allege as follows.

## Introduction

This case involves a fraudulent scheme whereby the Defendant conspired to identify a small business media buying agency to use as their puppet in order to collect hundreds of thousands of dollars in incentive bonuses from the United States government, defrauding the Plaintiffs in the process. Defendant McCann conspired to defraud and mislead the Plaintiffs into doing business with and extending credit to Defendant's sham buying agent, Penn, Good & Associates, LLP ("PGA"), all so that the Defendant could continue to collect Army incentive

bonuses for which it would otherwise no longer qualify.  Defendant represented to Plaintiffs that PGA had the financial capacity to manage advertising accounts with Plaintiffs and later hid PGA's cash flow problems from Plaintiffs.  Based on the assurances of and a longstanding business relationship with Defendant, Plaintiffs extended credit to PGA and placed Army advertisements on their respective networks.  To date, Plaintiffs have not been paid for certain ads, the invoices for which total over a million dollars.  Defendant knew of PGA's credit problems, and yet, persisted in making material misrepresentations and omissions to Plaintiffs regarding PGA's financial condition as well as its ability to manage a major advertising account. Defendant's behavior was indeed fraudulent and done with reckless disregard for the damage that it could cause, and did cause, to the Plaintiffs.

## Parties, Jurisdiction & Venue

1.      Plaintiff TV One is a limited liability company organized and existing under the laws of Delaware. TV One's principal place of business is in Silver Spring, Maryland.

2.      For purposes of diversity jurisdiction, a limited liability company is a citizen of each state of which any of its members are citizens.  *See JBG/JER Shady Grove, LLC v. Eastman Kodak Co.*, 127 F. Supp. 2d 700, 701 (D. Md. 2001).

3.       The sole member of TV One is Radio One Cable Holdings, LLC ("Radio One").  Radio One is a limited liability company organized and existing under the laws of Delaware.

4.      The sole member of Radio One Holdings is Urban One, Inc. ("Urban One").  Urban One is organized under the laws of the State of Delaware.  Urban One's principal place of business is in Maryland.

5.      Thus, TV One is a citizen of Delaware and Maryland and is not a citizen of any other state.

6.      Plaintiff Reach is incorporated under the laws of the State of Texas.  Reach's principal place of business is in Dallas, Texas.

7.      Thus, Reach is a citizen of Texas and is not a citizen of any other state.

8.      Defendant McCann is a global media and advertising corporation organized under the laws of the State of New York.  McCann's principal place of business is in New York, New York.

9.      Thus, McCann is a citizen of New York and is not a citizen of any other state.

10.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the Defendant is not a citizen of any state of which Plaintiffs are also citizens and the amount in controversy exceeds $75,000 exclusive of interest and costs.

11.     Defendants are subject to personal jurisdiction in this Court and venue is proper under 28 U.S.C. § 1391(b) because Defendants conduct business in the District of Maryland and because a substantial amount of the events giving rise to this action occurred in the District of Maryland.

## Factual Background

### The United States Army Contract Arrangement

12.     In or around 2004, McCann won a contract with the United States Army to formulate and execute advertising designed to increase Army recruitment within the African American community.

13.     The U.S. Army's contract with McCann included an incentive reward if McCann placed sufficient subcontracts with small, minority-run, and disadvantaged businesses.  The incentive reward was meant to further the United States government's goal, under the Small Business Administration's 8(a) Business Development Program, of trying to award at least five percent of all federal contracting dollars to small, disadvantaged businesses each year.

3

14.     Starting in at least 2006, McCann, wanting to capitalize on the incentive award, sought out and engaged Carol H. Williams Advertising, Inc. ("CHWA") to plan and place advertising on behalf of the U.S. Army in African American-targeted media outlets.

15.     In mid-2006, Defendants honed in on Plaintiff TV One because it was a popular and well-respected African American-targeted cable television network.   On June 16, 2006, CHWA signed an agreement with TV One entitled "New Customer Information Form and Credit Application and Agreement" (the "CHWA Credit Agreement").   Under the CHWA Credit Agreement, CHWA established a business relationship with TV One on behalf of itself and McCann for the placement of advertising on TV One's cable television network.

16.     After seizing on TV One, McCann was able to reap the benefit of the Army's incentive reward.   CHWA would submit its invoices to McCann reflecting the cost of placing the ads along with its labor costs, and McCann would then submit the invoices to the U.S. Army for payment.

17.     From July 2006 to June 2009, Defendant benefitted from this system wherein CHWA purchased hundreds of thousands of dollars of advertising from TV One on behalf of McCann and the U.S. Army.

18.     When CHWA became too large to qualify as a small business, Defendants decided to partner with LaGrant Communications ("LaGrant") in order to continue to qualify for the incentive reward.

19.     It is common in the media/advertising world for the same company to both plan and buy advertising. Thus, CHWA, under ordinary circumstances, would be completely replaced by LaGrant and would no longer take part in the Army contract.   CHWA, however, did not want to be cut out of the U.S. Army contract with McCann.   Instead, McCann suggested that CHWA

4

continue planning all aspects of the media strategy and simply direct another entity, one that still qualified as a small business under the SBA regulations, to be the go-between and place the buys on behalf of McCann.

20.     CHWA and LaGrant purchased media advertisements on behalf of McCann with Plaintiffs for several years without incident.

21.     Thereafter, the lucrative Army contract arrangement was again in jeopardy when Defendant discovered that LaGrant did not actually qualify as a small business, so Defendant scrambled to find a different small business in order to maintain the flow of money from the Army contract, as well as the incentive reward.

22.     On or about January 16, 2009, Defendants found PGA to replace LaGrant as the small business through which CHWA would place advertising orders.  PGA was certified by the Small Business Administration's 8(a) program as a small business and majority owned by disadvantaged individuals.  Therefore, signing a contract with PGA enabled McCann to continue collecting the incentive reward in connection with the U.S. Army contract.

23.     In practice, PGA (and LaGrant before it), was merely a "paper pusher," meaning that CHWA did all of the media planning and buying using PGA only to push the media buying paperwork through so that the Defendant could realize the benefits associated with engaging a qualified small business.

**McCann Induces TV One into Doing Business with PGA**

24.     On February 4, 2009, CHWA, at the direction of Defendant, notified TV One that PGA would be taking over all buy contracts for Army advertising on the network, effective March 31, 2009.

25.     After receiving notification that PGA was going to take over as buying agent for Defendant, TV One requested that PGA fill out a New Customer Information Form and Credit Application Agreement so that TV One could verify PGA's creditworthiness.

26.     Upon running a credit check and engaging in other due diligence, TV One immediately raised concerns to Defendant about PGA's poor credit rating and history.  In fact, PGA's credit was so poor that TV One initially required that PGA be a cash-in-advance client or that its orders be guaranteed.

27.     In an effort to salvage the relationship with TV One and ensure that Army advertising on the network was uninterrupted, CHWA represented, at McCann's urging, that it would remain lead in order to make TV One believe that payment for all advertising purchases would be paid as it had been in the parties' prior history of working together.  By email dated February 4, 2009, CHWA's Tuyet Nguyen represented to TV One that CHWA "will remain the lead African American planning and buying agency for the U.S Army AACM media buying segment" but that invoices should be directed to PGA.

28.     CHWA also urged TV One not to take further action to protect itself from PGA by representing that CHWA and McCann were working on a solution to PGA's credit issues.

29.     Specifically, by email dated April 1, 2009, when discussing TV One's hesitancy to accept advertising buys from PGA due to its poor credit and financial history, Tuyet Nguyen of CHWA, continued to put pressure on TV One to work with PGA and stated "[m]oving forward, I'm requesting TV One does not interrupt Army schedule as I'm working through the hiccups."

30.     In an email response that same day, TV One's Elverage Allen advised CHWA's Nguyen that TV One will require cash in advance prior to running Army advertising with PGA due to PGA's lack of credit worthiness and requested a phone conversation.

31.     During that call, CHWA, at the direction of McCann, pressured TV One to accept advertising buys from PGA and assured them they would get paid.

32.     TV One reasonably and foreseeably relied upon and accepted CHWA's representations, made on behalf and at the request of McCann, that PGA was merely an implementation agency and that the relationship would remain the same as it had in the past.

33.     In fact, TV One stated to CHWA by email dated April 1, 2009, "[o]ur credit application states that 'the agency and the advertiser will be jointly and severally liable'…. Based on this provision and our relationship with CHW[A], we will continue to run Army spots…."

34.     At no point did McCann's agent, CHWA, correct TV One's understanding of the arrangement or state to TV One that CHWA did not intend to ensure that PGA, as merely a puppet-buying agency, paid TV One for advertising placed at the direction of Defendants.

35.     McCann also did its part directly to ensure that TV One would continue to place ads despite PGA's financial issues.  McCann feared that TV One would decline to place further advertisements if PGA remained the "buying agent," so,  in a desperate bid to prevent TV One from pulling out of the arrangement, McCann fraudulently misrepresented the financial status and capabilities of PGA in order to induce TV One to place advertisements at PGA's request.

36.     By email dated April 22, 2009, Gary Barsky, McCann's Senior Vice President and Managing Partner of Portfolio Media, pressured TV One to continue to allow Army advertising to be placed through PGA, claiming that PGA only faced challenges by reason of being a small business, that McCann had worked with PGA to develop processes and procedures to manage the assignment, and that PGA had the "financial capacity and integrity to manage the account."

37.     McCann misrepresented that the financial condition of PGA was sound and that TV One should feel comfortable signing an advertising agreement with PGA on PGA's credit.

38.     McCann, in the same April 22 email to TV One, also vouched for CHWA, claiming that although PGA will be doing the media buying, CHWA will remain the lead agency for media planning and will work closely with PGA on all U.S. Army buying initiatives.

39.     Also on April 22, McCann's David Barsky forwarded the email between him and TV One to Austin Patrick and Kay Lucas at CHWA, telling CHWA: "We need to do what we can to make this work."

40.     Although TV One was unaware at the time, the Defendant's representations were, in fact, false and made in an effort to induce TV One to do business with PGA so Defendant could continue to realize monetary benefits under the U.S. Army contract.

41.     First, at no time did the Defendant work with PGA to develop any processes or procedures to manage the TV One advertising contract.

42.     Next, Defendant did not engage in the necessary due diligence to verify that PGA was economically stable enough to handle the advertising account with TV One.   Based on information discovered in 2017, McCann only performed a cursory check to see if PGA qualified as a small business for purposes of the U.S. Army's goals and incentive award payment rather than conduct the "due diligence" McCann told TV One it had performed.

43.     Lastly, Defendant misrepresented PGA as being financially sound.   Having failed to perform even the most basic of financial checks, Defendant could not claim that PGA was financially healthy.   Defendant knew or should have known that PGA had emerged from Chapter 11 bankruptcy in August 2008, only months before being engaged by McCann and that Garrick Good, one of the principals of PGA, had been involved in approximately a dozen lawsuits prior to McCann engaging PGA as its "buying agent."   Thus, at the very least, Defendant recklessly represented that PGA was financially sound.

8

44.     McCann characterized the relationship between it, PGA, and TV One as a "partnership" and agreed to pay for all advertising placed on its behalf.  McCann also set forth a payment process which it stated was to "eliminate exposure" to McCann's partners, in this instance, TV One.

45.     These communications and representations by McCann were made in an effort to lull TV One into a false sense of comfort and to ensure that TV One would not discontinue running advertisements for the Army contract despite the fact that McCann knew that it had no intention of making good on the partnership in the event that its puppet buying agent, PGA, collapsed.

46.     Defendant also took advantage of the parties' course of dealing.  By 2009, TV One and the Defendant had established a three-year business relationship.  Defendant therefore had a duty to act in good faith towards TV One and to avoid making harmful misrepresentations.  Instead, Defendant manipulated the trust and good faith that had been built over that time to make false assurances to TV One, and had every reason to know, given the parties' history, that TV One would rely on those representations.

47.     Defendant made or directed to be made numerous misrepresentations and material omissions regarding which parties were going to be ultimately responsible for the advertising buys, the financial condition of PGA, and other critical facts in order to induce TV One into doing business with PGA.  TV One had no way of knowing that McCann did not intend to make sure that TV One was paid in full for the advertising placed on McCann's behalf.

48.     Based on the above misrepresentations and assurances, TV One allowed PGA to place advertising buys with TV One.  However, PGA failed to pay TV One for such advertising in the approximate amount of $930,268.11.

49.     TV One has been damaged because it did, in fact, rely on the parties' course of dealing and the Defendant's misrepresentations and assurances in allowing PGA to place Army advertisements for which $930,268.11 remains due and owing.   Absent the Defendant's misrepresentations, TV One would have never entered into a business arrangement with PGA.

**McCann Induces Reach into Doing Business with PGA.**

50.     TV One was not the only business harmed by the Defendant's fraudulent scheme.

51.     Plaintiff Reach is an African-American targeted radio network, most popular for airing the Tom Joyner Morning Show, a radio program airing in approximately 105 media markets and reaching nearly eight million listeners.

52.     In April 2009, the time period when Defendant was attempting to install PGA as the puppet buying agent for the Army contract, a substantial percentage of Reach's current business operations, including its Corporate Sales department responsible for placing radio ads, was still part of TV One's parent company, Radio One.

53.     Accordingly, in 2009, Defendant engaged Radio One (which later became Reach for purposes of the radio advertising placements), through their puppet buying agent PGA, to place radio advertisements in order to increase the frequency and amount of U.S. Army advertising to the African American market.

54.     Similarly to TV One, Radio One had serious reservations about PGA's creditworthiness, including PGA's recent Chapter 11 bankruptcy, and informed McCann that Radio One would not run advertisements on credit with PGA absent assurances from McCann that it would ensure that Radio One was paid for all advertisements placed on McCann's behalf.

55.     By email dated April 22, 2009, McCann's Gary Barsky, pressured Radio One to allow Army advertising to be placed through PGA, claiming that PGA only faced challenges by reason

of being a small business, that McCann had worked with PGA to develop processes and procedures to manage the assignment, and that PGA had the "financial capacity and integrity to manage the account."

56.     However, as discussed above, McCann either misrepresented that it engaged in due diligence with respect to PGA and its financial stability or affirmatively misrepresented that PGA was in good financial condition as PGA had just emerged from bankruptcy and faced a continuous financial struggle.

57.     Thereafter, William Brown from Radio One reached out to Gary Barsky at McCann to voice Radio One's continued concern with PGA's financial stability and to inform McCann that it could not extend credit to PGA under these circumstances absent assurances of joint and several responsibility from McCann.  McCann represented to Radio One that there was "nothing to worry about" and that McCann would "make sure" that Radio One was paid for advertising placed on its network on behalf of McCann.

58.     In other correspondence from McCann to Radio One, McCann characterized the relationship between it, PGA, and Radio One as a "partnership" and agreed to pay for all advertising placed on its behalf.  McCann also set forth a payment process which it stated was to "eliminate exposure" to McCann's partners, in this instance, Radio One and later, Reach.

59.     These communications and representations by McCann were made in an effort to lull Radio One into a false sense of comfort and to ensure that Radio One would run advertisements for the Army contract despite the fact that McCann knew that it had no intention of making good on the partnership in the event that its puppet buying agent, PGA, collapsed.

60.     Radio One ultimately agreed to allow PGA to order advertising on credit based on the representations made by McCann as well as the understanding that McCann would be jointly and severally liable for all advertising buys made on its behalf.

61.     In December of 2012, due to corporate restructuring, Radio One's Corporate Sales function, which was responsible for the Army advertising, moved to Plaintiff Reach.

62.     Defendants, through their sham buying agent, PGA, placed orders with Reach for a number of advertisements on behalf of the U.S. Army during the last quarter of 2014.  Reach accepted these orders, based on the representations made to its predecessor, Radio One, and broadcasted the Army radio commercials as requested, for which Defendant agreed to compensate Reach in the amount of $545,000.00.

63.     Reach as successor-in-interest to Radio One, reasonably and foreseeably relied on McCann's representations.   Absent the above representations, Radio One would not have extended credit to PGA in the first instance and Reach, as its successor-in-interest, would not have continued to do business on credit with PGA after December 2012.

64.     At no time did McCann deny or make any attempt to alter Radio One's understanding that McCann was jointly and severally liable for the advertising buys and Radio One had no way of knowing that McCann did not intend to make sure that Radio One (and its successor) were paid in full for the advertising placed on McCann's behalf.

65.     Defendant also took advantage of the parties' course of dealing.  By 2009, Radio One and the Defendant had established a three-year business relationship.  Defendant therefore had a duty to act in good faith towards the Radio One and to avoid making harmful misrepresentations. Instead, Defendant manipulated the trust and good faith that had been built over that time to

make false assurances to Radio One, and had every reason to know, given the companies' history, that Radio One, and later Reach, would rely on those representations.

66.     By and through the misrepresentations and omissions made to its predecessor-in-interest, Radio One, Reach has been damaged in the amount of $375,218.60, which Defendant have thus far failed to pay.

**Defendant McCann "Props Up" PGA to Hide Its Financial Problems from Plaintiffs**

67.      Despite being fully aware of Plaintiffs' hesitancy to do business with PGA due to PGA's poor credit and financial history, Defendant failed to inform Plaintiffs when PGA began having financial troubles as early as 2012.

68.     Defendant knew or should have known that a principal of PGA, Garrick Good, filed for chapter 7 bankruptcy in September 2012.

69.     And as early as January 2013, Defendant was also aware that not only PGA's principals but PGA itself was running into financial problems.

70.     In an effort to conceal PGA's financial troubles from Plaintiffs, McCann launched a campaign to "prop up" PGA with the hope that it might recover before endangering Defendant's lucrative arrangement with the Army.

71.     In early 2013, McCann advanced PGA funds to cover its high labor costs which were not covered by the U.S. Army contract.

72.     On November 5, 2013, and unbeknownst to Plaintiffs, McCann apprised PGA that McCann would start withholding certain amounts owed to PGA in order to pay back the amounts that McCann had advanced.

73.     Under this new process, McCann submitted invoices to the U.S. Army for the running of advertisements, but McCann never ensured that the money for advertisements was paid to the Plaintiffs.

74.     McCann also falsely represented to the U.S. Army that the funds the U.S. Army paid to McCann for the advertisements were being paid to the Plaintiffs.

75.     At no point did Defendant inform Plaintiffs that Plaintiffs' greatest concern regarding this relationship – PGA's financial condition and ability to make good on monies owed to Plaintiffs – was coming to fruition.

76.     PGA failed to pay TV One for services rendered pursuant to the U.S. Army contract beginning in September 2013.

77.     PGA failed to pay Reach for services rendered pursuant to the U.S. Army contract in the last quarter of 2014.

78.     Had Defendant informed Plaintiffs of PGA's financial troubles, Plaintiffs would have taken steps to mitigate any damages and, in fact, may have been able to prevent all damages caused in this case.

79.     Plaintiffs foreseeably and reasonably relied on Defendant's misrepresentations and material omissions regarding PGA's financial difficulties.  Otherwise, Plaintiffs would not have continued to place advertisements requested by McCann and CHWA through PGA and would have taken affirmative steps to mitigate damages.

80.     Plaintiffs did not discover the Defendant's above-described misrepresentations and omissions until the fall of 2017.

81.     As a further consequence of Defendant's misrepresentations and material omissions, TV One has incurred $506,543.77 in litigation expenses to recover the amounts due from

Defendant's "partner" entity, PGA.   Absent Defendant's misrepresentations and omissions regarding PGA's financial status, TV One would have been aware of PGA's true financial status and would have required McCann to pay cash in advance instead of extending credit through PGA.   As such, TV One has been further damaged in the amount of $506,543.77, which represents the attorney's fees TV One spent to recover funds based on McCann's misrepresentations and omissions.

82.    Due to the Defendant's misrepresentations and material omissions, TV One has been damaged in the amount of no less than $1,436,811.88.

83.    Due to the Defendant's misrepresentations and material omissions, Reach has been damaged in the amount of no less than $375,218.60.

**Breach of Oral Agreement**

84.    Prior to discovering McCann's fraudulent misrepresentations and omissions, but based on the nonpayment described above, TV One brought a breach of contract lawsuit against CHWA and PGA to recover the amounts due to TV One.

85.    As part of those proceedings, CHWA asserted that McCann was required to indemnify it for any amounts that were determined to be owed by it to TV One.

86.    On February 9, 2017, in an effort to resolve the claims against CHWA and any potential exposure to McCann by way of CHWA's indemnity claim, Plaintiff and Defendant participated in mediation.

87.    At this mediation, McCann and TV One entered into an oral agreement to settle TV One's claims against CHWA and thereby limit McCann's exposure through CHWA's indemnity claim.   The parties mutually agreed that TV One would dismiss all claims with prejudice against CHWA and in exchange McCann would pay TV One $550,000.00.

88.     Within days, and despite TV One's intent to fulfill its end of the bargain, McCann repudiated the oral contract and indicated that it would not pay TV One the amount previously agreed upon.

89.     To date, McCann has failed and refused to fulfill its contractual obligation and this breach has caused damage to TV One.

## COUNT I: BREACH OF ORAL CONTRACT

90.     Plaintiffs restate and re-allege each of the foregoing allegations as though fully set forth herein.

91.     On February 9, 2017, Defendant and Plaintiff entered into an oral contract which provided that TV One would dismiss its claims against CHWA with prejudice and, in exchange, McCann would pay TV One $550,000.00.

92.     TV One had every intention of fulfilling its end of the agreement, namely, dismissing its claims against CHWA with prejudice.

93.     However, before TV One could do so, McCann repudiated the oral contract and indicated that it would not pay TV One the amount previously agreed upon.

94.     Due to Defendant's breach of the oral agreement, TV One has been damaged in the amount of no less than $550,000.00.

## COUNT II: FRAUDULENT MISREPRESENTATION

95.     Plaintiffs restate and re-allege each of the foregoing allegations as though fully set forth herein.

96.     As described in detail above, McCann made affirmative misrepresentations of fact concerning PGA's financial ability and its intent to keep CHWA as the lead buying agent in charge of the Plaintiffs' accounts.

97.     McCann either knew these statements were false when made or made the statement with reckless indifference as to its truth so that Plaintiffs would cooperate with PGA and McCann could meet the U.S. Army's goals and receive the incentive award.

98.     Through its affirmative misrepresentations, McCann led Plaintiffs to believe that the addition of PGA did not change the fact that McCann and/or CHWA was actually in control and lead on all advertising buys and payment of the same.

99.     McCann made these statements in order to induce Plaintiffs to extend credit to PGA so that McCann could meet the U.S. Army's goals and receive the incentive award.

100.    Plaintiffs were entitled to and did reasonably rely upon the misrepresentations made by McCann in deciding to do business with and extend credit to PGA as the sham "buying agent."

101.    Plaintiffs suffered damages as a result of its reliance on the misrepresentations by McCann.  Specifically, Plaintiffs have suffered damages in the amount of $1,812,030.48, plus interest, costs, and attorney's fees.

## COUNT III: FRAUDULENT OMISSION

102.    Plaintiffs restate and re-allege each of the foregoing allegations as though fully set forth herein.

103.    Based on the nature of the parties' historical and ongoing relationship, McCann had a duty to disclose PGA's financial troubles starting in 2012-13 but failed to disclose such information to Plaintiffs.

104.    McCann failed to disclose PGA's financial troubles to Plaintiffs because it did not want to lose the incentive award it received from using PGA as a puppet subcontractor.

105.    McCann failed to disclose PGA's financial condition to Plaintiffs intending and knowing that Plaintiffs would rely on the omission.

106.    Based on the longstanding business relationship between the parties, Plaintiffs justifiably relied on McCann's omission.

107.    Plaintiffs were injured by such reliance and have suffered damages in the amount of $1,812,030.48, plus interest, costs, and attorney's fees.

## COUNT IV:  NEGLIGENT MISREPRESENTATION

108.    Plaintiffs restate and re-allege each of the foregoing allegations as though fully set forth herein.

109.    Based on the longstanding business relationship between McCann and Plaintiffs, McCann owed a duty of care to Plaintiffs.

110.    McCann negligently made various false statements to Plaintiffs regarding the financial condition of PGA as well as the active role CHWA and McCann would play in the arrangement.

111.    McCann made the false statements regarding PGA's financial condition and CHWA and McCann's role in ensuring payment of invoices intending and knowing that TV One would rely on them.

112.    Based on the longstanding business relationship between the parties, Plaintiffs foreseeably and reasonably relied on McCann's representations.

113.    Plaintiffs were injured by such reliance and have suffered damages in the amount of $1,812,030.48, plus interest, costs, and attorney's fees.

## COUNT V: NEGLIGENT OMISSION

114.    Plaintiffs restate and re-allege each of the foregoing allegations as though fully set forth herein.

115.    Based on the longstanding business relationship between McCann and Plaintiffs, McCann owed a duty of care to Plaintiffs.

116.    McCann had a duty to disclose PGA's financial problems to Plaintiffs.

117.    McCann failed to disclose PGA's financial troubles because it did not want to lose the incentive award it received from using PGA as a puppet subcontractor.

118.    McCann failed to disclose PGA's financial condition intending and knowing that Plaintiffs would rely on the omission.

119.    Based on the longstanding business relationship between the parties, Plaintiffs foreseeably and reasonably relied on McCann's omission.

120.    Plaintiffs were injured by such reliance and have suffered damages in the amount of $1,812,030.48, plus interest, costs, and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against each and every Defendant, jointly and severally, as follows:

1.    Damages in the amount of $1,812,030.48.

2.    Prejudgment and post-judgment interest on any monetary award at the highest rate allowed by law.

3.    Punitive damages.

4.    Reasonable attorney's fees and costs of suit.

5.    Such other and further relief as this court deems just and proper.

Dated: August 17, 2018                    Respectfully submitted,

                                          **MORRIS, MANNING & MARTIN, LLP**

                                          */s/ Bonnie Y. Hochman Rothell*
                                          Bonnie Y. Hochman Rothell
                                          Jessica A. Rodriguez
                                            *Pro hac vice motion forthcoming*
                                          Curtis Arnold, Jr.
                                            *Pro hac vice motion forthcoming*
                                          1401 Eye Street, NW, Suite 600
                                          Washington, DC 20005
                                          Telephone: (202) 408-5153
                                          Facsimile: (202) 408-5146
                                          bhrothell@mmmlaw.com
                                          jrodriguez@mmmlaw.com
                                          carnold@mmmlaw.com

                                          *Attorneys for Plaintiffs TV One, LLC and
                                          Reach Media, Inc.*